[Civ. No. 2655.    Third Appellate District.—April 28, 1924.]

MARY E. DUFFIELD et al., Respondents, v. JOHN BARTON PAYNE, as Agent, etc., et al., Appellants.

[1] NEGLIGENCE — INJURY TO PASSENGER — PROOF — PRESUMPTION.— No presumption of negligence arises from mere proof of injury or death of a person while a passenger upon a railroad train.

[2] ID.—FAILURE TO GUARD TRAIN VESTIBULE—INVITATION TO ALIGHT —CARE REQUIRED OF PASSENGER.—Where, to the knowledge of a passenger, it is a rule of a common carrier, or a custom of those in charge of its trains, to keep the vestibules closed or guarded at all times while the trains are in motion, an open unguarded vestibule is in the nature of an invitation to such passenger to alight, if he have occasion to do so, and an assurance that he may alight with safety, the passenger, of course, being held to the exercise of ordinary care for his own safety, notwithstanding the open vestibule.

[3] ID.—DUTY OF BRAKEMAN TO GUARD OPEN DOOR.—Where the train was to stop in the dark at a mere siding where there were no buildings or lights from the observance of which a passenger could perceive that the train was moving, and only one passenger was to alight, and there was but one door to open and guard, and no duty of the brakeman called him elsewhere, the duty of the brakeman to guard the door as much as he could, or as much

---

1. See 4 Cal. Jur. 984; 5 R. C. L. 81.

2. Liability of carrier for accident through leaving vestibule doors open, note, 2 L. R. A. (N. S.) 645. See, also, 4 Cal. Jur. 951, 974; 4 R. C. L. 1216, 1247.

3. See 4 Cal. Jur. 958.

as was possible, required that he guard it during all the time it was open.

[4] ID.—NEGLIGENCE OF BRAKEMAN—QUESTIONS FOR JURY.—In this action for damages for the death of plaintiffs' intestate, alleged to have been caused by the negligence of defendants in the operation of a railroad train upon which the deceased was a passenger, it could not be said as a matter of law that the acts and omissions of the brakeman in announcing the station at which the deceased was to alight, opening the door, and then failing to guard it until the train came to a stop, under all the circumstances, did not warrant the inference that the brakeman. was negligent or that the conduct of the deceased was free from negligence, but such questions were for the jury to determine.

[5] ID. — CONTRIBUTORY NEGLIGENCE — BURDEN OF PROOF — INSTRUCTIONS.—In such action, the defendants having alleged that the deceased was guilty of contributory negligence, the court did not err in refusing defendants' requested instruction that, "If, after considering all the evidence before you, your minds are still in a state of reasonable uncertainty as to whether plaintiffs are entitled to recover, your verdict must be for defendant"; but, even though the . refusal of such instruction was error, the jury was fully instructed as to the proof necessary to entitle the plaintiffs to recover.

[6] ID.—EXCESSIVE DAMAGES—APPEAL.—In this action for damages, while the amount of the judgment was large, it could not be said that the damages awarded were so excessive as to warrant a reduction thereof on appeal or a reversal of the judgment.

(1) 10 C. J., p. 1024, sec. 1426.    (2) 10 C. J., p. 1134, sec. 1507.
(3) 10 C. J., p. 961, sec. 1378.    (4) 10 C. J., p. 1078, sec. 1469.
(5) 29 Cyc., p. 644.    (6) 17 C. J., p. 1350, sec. 235.

APPEAL from a judgment of the Superior Court of Colusa County. Ernest Weyand, Judge. Affirmed.

4. See 4 Cal. Jur. 987; 19 Cal. Jur. 719; 5 R. C. L. 961; 20 R. C. L. 166.

5. Alighting from train where act is obviously dangerous as contributory negligence, notes, 1 Ann. Cas. 778; 17 Ann. Cas. 1154. See, also, 2 Cal. Jur. 1026; 4 Cal. Jur. 965; 2 R. C. L. 261; 5 R. C. L. 21.

6. What is excessive verdict for death by wrongful act, notes, 18 Ann. Cas. 1209; Ann. Cas. 1915C, 449. See, also, 8 Cal. Jur. 1023; 8 R. C. L. 849.

Rules guiding courts on appeal in determining excessiveness or inadequacy of verdicts in actions for personal injuries resulting in death, note, L. R. A. 1916C. 810.

The facts are stated in the opinion of the court.

Frank Freeman and George R. Freeman for Appellants.

Arthur C. Huston and Arthur C. Huston, Jr., for Respondents.

FINCH, P. J.—Plaintiffs, the surviving wife and children of Jesse D. Duffield, deceased, were given judgment for damages in the sum of ten thousand dollars for the death of the latter, alleged to have been caused by the negligence of defendants in the operation of a railroad train upon which he was a passenger. The defendants have appealed.

Appellants contend that they are entitled to a reversal of the judgment on the following grounds: (1) That the evidence does not show negligence on the part of defendants; (2) That it shows contributory negligence on the part of deceased; (3) That the court erred in refusing certain proposed instructions; (4) That the verdict is excessive.

The evidence shows that Harrington and Coyle are flag stations at which there are no buildings or lights, the latter being a mile north of the former. Deceased was a passenger on the northbound train from Sacramento to Coyle. He had purchased a ticket to Harrington only, as tickets were not being sold to Coyle. He requested the conductor to let him off at Coyle instead of Harrington and the latter agreed to do so, there being no other passenger for either place. The accident occurred shortly after 9 o'clock at night. It was dark at that time. The weather was clear. The train passed Harrington at a speed of thirty-five miles an hour. Immediately thereafter the brakeman signaled the engineer to stop at Coyle and then walked from the rear to the center of the smoker, in which deceased was riding, and announced that the next station was Coyle. He then went to the rear platform. Duffield followed and stood in the door, with one foot probably on the platform. While standing there he said "something about being home soon" and the brakeman replied, "Yes." No other conversation was had between them. In the vestibule, at the side of the car door, was a guard-rail which stood in a perpendicular position when the vestibule door was closed and was lowered to a horizontal position when it was opened. When so lowered

the guard-rail served to hold the vestibule door open and as a hand-rail for passengers boarding or alighting from the car. On reaching the platform the brakeman opened the vestibule and trap-doors and lowered the guard-rail to the horizontal position. While the guard-rail was being let down "Duffield had his hand on it." He did not remove his hand but "let it slide right down." When last seen prior to the accident he had hold of this guard-rail. What occurred thereafter can best be told in the language of the brakeman, who testified: "I turned around and stepped across to the vestibule (of the next car to the rear), about six feet, and picked up my lantern, and as I turned around and stepped back, I just saw a glimpse of an object disappearing out the doorway, and I pulled the signal for the engineer to stop, and when we did, we picked up Mr. Duffield where he was lying there by the track." The train was brought to a stop in about ten car lengths. The signal given was not an emergency signal but a stop signal. When the signal to stop at Coyle was given the engineer shut off steam, allowing the train to drift, and then "made a light application of the air, five or six pounds, to take up the slack in the brakes and gradually reduced the speed" to about twenty-five miles an hour within a quarter of a mile. It was constantly decreasing from that time on. At the time the second signal was given the train was within about one hundred rods of Coyle. The track was in good condition. There was no "jar or jerk" of the train at any time. The vestibules of both cars were lighted. The light was shining on the steps but it was not strong enough for the brakeman to recognize the object which he saw disappearing through the door.

The conductor who had charge of the train testified as follows: "There is no laid down rule in regard to opening the trap doors. Q. Well, what instructions if any did the brakeman have? A. To open the door as conveniently to the station as they can. Q. Well, what about guarding them? A. Guarding them as much as they can. Q. And is it a question of guarding them as much as they can, or guarding the trap door while open? A. Well, it is as much as you can." The brakeman testified: "Q. What duties were you given in connection with the operation of this train? A. Protecting the train and announcing stations.

. . . Q. What was your duty in regard to opening and closing these trap doors and the vestibule of the car? A. Approaching a station, to open it. Q. And close them when? A. After leaving the station. Q. And what, if any, were your duties with reference to guarding these trap doors while open? A. Well, when it was possible to stay there and look after them. Q. And did you receive instructions with reference to these trap doors under any rule? A. No, sir. Q. And who gave you your instructions? A. There were no instructions given us. . . . Q. Well then, how did you learn that it was your duty to guard these doors in the manner in which you have described. A. Well, it was a matter of 'safety first.' Q. . . . In calling your station and giving the signal after you left Harrington, was that the usual way of stopping the train for Coyle? A. Yes, sir. . . . Q. And no greater distance between the time of giving that signal that night than any other night? A. Just the same."

The deceased was seventy-four years of age at the time of his death. "He was in perfect health, . . . perfectly active; did more work than most of the young men are doing nowadays." He had full use of all his faculties. His eyesight was very good. He was not weakened from age in the way of handling himself and walked vigorously. He had been accustomed to alight from the train at Coyle and had alighted there several times at night.

[1] No presumption of negligence arises from mere proof of injury or death of a person while a passenger. (*Rystinki* v. *Central California T. Co.*, 175 Cal. 336, 344 [165 Pac. 952] ; *Steele* v. *Pacific Electric Ry. Co.*, 168 Cal. 375, 379 [143 Pac. 718].)

In the absence of a rule or custom to keep vestibule doors closed or guarded while trains are in motion, it has generally been held that mere proof of an open and unguarded vestibule door during the time a train is slowing down for the purpose of stopping at a station is not sufficient to establish negligence on the part of a carrier or to constitute an invitation to passengers to alight while the train is in motion. In *Baltimore & O. S. R. Co.* v. *Mullen*, 217 Ill. 203 [2 L. R. A. (N. S.) 115, 75 N. E. 474], it is said: "If there had been nothing more than the calling of the name of the station, or the fastening back of the vestibule

doors, it could not be said that the appellee was invited
by an employee of the company to alight.'' It was held,
however, that when these facts were considered in connec-
tion with other circumstances shown by the evidence, the
question of the company's negligence was for the jury.    In
*Union Pac. R. Co.* v. *Brown,* 73 Kan. 233 [84 Pac. 1026],
it is said: ''It is necessary to the efficient and orderly con-
duct of the business of carrying passengers in vestibuled
railway coaches and necessary for the convenience and ac-
commodation of the passengers that the vestibules be opened
before the stopping of trains at stations and, as the practice
does not expose the passengers to any considerable danger,
the opening of a vestibule at any time after the usual call
for a station is not, under ordinary circumstances, and was
not in this case, *per se* negligence.'' In *Gayle's Admr.* v.
*Louisville & N. R. Co.,* 163 Ky. 459 [173 S. W. 1113], the
court said: ''The announcement of the station and the open-
ing of the doors did not constitute an invitation to alight
until the train stopped.'' The case of *Illinois C. R. Co.* v.
*Dallas,* 150 Ky. 442 [150 S. W. 536], is to the same effect.
In *Elger* v. *Boston Elevated Ry. Co.,* 226 Mass. 84 [115
N. E. 242], in affirming a judgment for defendant, it is
said: ''On the facts disclosed, the opening of the door and
the announcement of the name of the next stop, plainly did
not constitute an invitation to the plaintiff to alight from a
moving car.''   To the same effect is the case of *Hooker* v.
*Blair,* 189 Mich. 278 [155 N. W. 364].  In *Pagnini* v. *North
Jersey St. Ry. Co.,* 69 N. J. L. 60 [54 Atl. 218], it was
held that the mere opening of the gate before the car comes
to a stop ''will not raise a presumption of actionable negli-
gence.''   In *Mearns* v. *Central R. Co.,* 163 N. Y. 108 [57
N. E. 292], the facts were similar to those in the instant
case, except that there was no evidence relative to any rule
or custom to guard the vestibule doors when they were open
while the train was moving.   The trial court rendered judg-
ment in favor of defendant.   The judgment was affirmed
on appeal.   Had the verdict and judgment in this case been
in favor of defendants, an affirmance would be necessary,
because the finding of a court or jury, based upon evidence
from which opposing inferences may reasonably be drawn,
is conclusive on appeal.   In *Blue Grass Traction Co.* v.
*Skillman,* 31 Ky. Law Rep. 480 [102 S. W. 809], in which a

judgment against the company was affirmed, the proof
showed other circumstances indicating negligence in addition
to proof of calling the station and then opening the door
while the car was in motion. It was held that such proof
was sufficient to show that the conductor knew of the pas-
senger's danger, "or by the exercise of ordinary care should
have known it, and negligently failed to warn her of the
danger."

[2] The decisions are to the effect that where, to the
knowledge of a passenger, it is a rule of a common carrier,
or a custom of those in charge of its trains, to keep the
vestibules closed or guarded at all times while the trains
are in motion, an open and unguarded vestibule is in the
nature of an invitation to such passenger to alight, if he
have occasion to do so, and an assurance that he may alight
with safety, the passenger, of course, being held to the exer-
cise of ordinary care for his own safety, notwithstanding
the open vestibules. The doctrine is analogous to that ap-
plying to open gates at railroad crossings. "The defendant
was not bound to have the car vestibuled; but, having done
so, it could not by acts and words lead its passengers to
believe that the doors of the vestibule would be kept closed
between stations, and then negligently leave them open, with-
out incurring liability to passengers injured thereby."
(*Crandall* v. *Minneapolis etc. Ry. Co.*, 96 Minn. 434 [113
Am. St. Rep. 653, 2 L. R. A. (N. S.) 645, 105 N. W. 185];
*Rivers* v. *Pennsylvania R. Co.*, 80 N. J. L. 217 [83 Atl.
883].) "It was the custom, of which plaintiff was aware,
for the motorman not to open the doors to permit passengers
to alight until the car had come to a full stop. . . . Plaintiff
had a right to rely upon the custom shown in evidence."
(*Tillery* v. *Harvey* (Mo.), 214 S. W. 246.) This case is
cited in *Kirby* v. *United Rys. Co.* (Mo.), 242 S. W. 79,
where it is said: "It has been held that the opening of a
vestibuled door after a car had slowed down for a stop,
but while moving very slowly, and before it had come to a
full stop, was an invitation to alight, where, on account of
darkness and other conditions, a passenger was misled
thereby." In *Ferrell* v. *Washington Water Power Co.*,
83 Wash. 319 [145 Pac. 442], in reversing a judgment of
nonsuit, it is said: "Assuming that it is a matter of com-
mon knowledge of a passenger that the gates of a pay-as-you-

enter car are closed while it is in motion, we think it would be going too far to hold that the opening of the door was not an invitation to appellant to pass out of the car, or at least to step down into the vestibule.''

[3]  The conductor testified that the brakemen were instructed to guard the trap-doors when open ''as much as they can.'' The brakeman testified that it was his duty ''when it was possible to stay there and look after them.'' The evidence shows that Duffield had frequently traveled on defendants' trains. It is a fair inference that he was familiar with the custom, or practice, of guarding the vestibule doors when open. The train was to stop in the dark at a mere siding where there were no buildings or lights from the observance of which a passenger could perceive that the train was moving. Only one passenger was to alight. There was but one door to open and guard. No duty of the brakéman called him elsewhere. Under such circumstances, to guard the door as much as he could, or as much as was possible, would be to guard it during all the time it was open. [4]  On that occasion the brakeman clearly did not follow instructions. The engineer had shut off steam and the train was smoothly drifting towards the siding, the movement thereof probably being imperceptible to Duffield. The brakeman knew, according to his own testimony, when the train passed Harrington, and the natural inference is that Duffield did not, there being no buildings or lights there, and it being a matter of common knowledge that passengers usually rely upon the announcement of their stations by the brakemen. His judgment was not so accurate as that of the experienced brakeman as to the length of time required for the slowing train to reach Coyle after the station was announced. While the light in the vestibule was sufficient to enable one to see the steps, a fair inference is that it was not strong enough to make the adjacent ground visible, because it was too dim for the brakeman to distinguish the object which he saw disappear out the door. The two men did not have equal knowledge of the situation. The brakeman was bound to the exercise of the highest degree of care and foresight for the safety of the passenger. The latter was bound only to the exercise of ordinary care. When the brakeman, knowing that Duffield was standing with his hand on the guard-rail, ready

to go down the steps to alight, opened the vestibule doors and then turned and walked back to the vestibule of the next car, it was most natural for Duffield, if he believed that the train had stopped, to interpret the acts' of the brakeman as an invitation to alight.

It cannot be said as a matter of law that the acts and omissions of the brakeman, under the foregoing circumstances, do not warrant the inference that he was negligent or that the conduct of Duffield was free from negligence. "When it can be affirmed that all reasonable men would agree as to the quality of an act in respect of its being either negligent or prudent, the court may give effect to such consensus of opinion and direct a verdict in accordance therewith. The direction is given, not because it is the judge's opinion alone, but because the judge is able to say that it is also the opinion that all reasonable men would entertain of the question. If there is doubt as to whether all reasonable men would draw the same conclusion from the evidence, then the question must be submitted to the twelve reasonable men appointed by the Constitution to determine disputed or doubtful questions of fact." (*Brown* v. *Oakes,* 76 Fed. 734 [22 C. C. A. 520].)

The jury may have concluded, and reasonably so, that when the brakeman turned to pick up his lantern, after opening the doors, he should have anticipated that Duffield might be misled into the belief that the train had stopped and that he should have warned Duffield not to attempt to alight. "The carrier owes to the passenger the duty of protection during transportation. . . . This duty of care involves warning of danger so far as such warning may enable the passenger to protect himself against an injury which might be anticipated in the exercise of a high degree of care and foresight, and the carrier will be liable for an injury which might have been avoided if due warning had been given. . . . There is no duty, however, to warn a passenger of his danger where the conditions which constitute the danger are as observable by him and apparently as obvious to him as to the employees of the carrier." (10 C. J. 910.) The conditions which constituted the danger to which Duffield was exposed were not "as observable by him and apparently as obvious to him as to the employees." The plaintiffs were under the necessity of relying entirely

upon the testimony of the trainmen, defendants in the action, to prove negligence, a fact which was probably given due consideration by the jury in weighing the evidence.

It is contended that the court erred in refusing to give two instructions proposed by defendants. **[5]** All the propositions contained therein had been repeatedly stated in instructions given, except the following: "If, after considering all the evidence before you, your minds are still in a state of reasonable uncertainty as to whether plaintiffs are entitled to recover, your verdict must be for the defendant." The requested instruction is a copy of one approved in *Green* v. *Birmingham Ry. Light & Power Co.*, 187 Ala. 508 [65 South. 781]. Whether or not the instruction is a correct statement of law, it would tend to mislead the jury into the belief that plaintiffs were required to prove their case beyond a reasonable doubt. If correct as applied to the question whether a plaintiff has made out a *prima facie* case, it does not follow that it would be correct as applied to conflicting evidence, where a *prima facie* case has been made. (*People* v. *Miller*, 171 Cal. 649, 653 [154 Pac. 468].) The defendants herein alleged that Duffield was guilty of contributory negligence. If the jurors found that the defendants were negligent, but their minds were "in a state of reasonable uncertainty" as to whether Duffield also was negligent, then the instruction would have required them to reverse the rule as to burden of proof of contributory negligence and return a verdict for defendants, notwithstanding the latter's negligence. In any event, the jury was fully instructed as to the proof necessary to entitle the plaintiffs to a verdict. Among others, the following instructions were given at the request of defendants: "A recovery of damages against the defendant in this case can only be had when after a careful consideration of all evidence before you, plaintiffs have satisfied you by a preponderance of such evidence that the death of the deceased was the result of the negligence of the defendant. . . . The burden of such proof is upon plaintiffs, and must be proved by a preponderance of the evidence, otherwise your verdict must be for defendants."

**[6]** The deceased was of the age of seventy-four years and two months at the time of his death. The expectancy of life of a man of that age is nearly seven years. Mr.

Duffield was in perfect health, vigorous and active. "Never had a real sick spell" in forty-six years. "Did more work than most of the young men are doing." From the condition of his health at the time of his death, the jury may have believed that Duffield's expectancy of life was more than seven years. He and his wife were living on a forty-acre farm, of which six acres were in four year old almond trees. He was raising twenty to twenty-five head of cattle and a few hogs. He did his own work and supported his family. His wife, one of the plaintiffs, who had lived with him as such for forty-six years, was of the age of sixty-six years at the time of his death. There was no direct proof, in terms of money, of the annual earnings of deceased or of the amount expended by him in support of his family. In estimating the pecuniary loss suffered by the plaintiffs the jury had the right to include the value of the society, comfort and protection of deceased of which they were deprived. In actions of this character "such damages may be given as under all the circumstances of the case may be just." (Code Civ. Proc., sec. 377.) While the amount of the judgment is large, it cannot be said that the damages awarded are so excessive as to warrant a reduction thereof on appeal or a reversal of the judgment.

The judgment is affirmed.

Hart, J., and Plummer, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 26, 1924.